# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

|   |   |
|---|---|
| IN RE: WILMINGTON TRUST CORP. | ) |
| ERISA LITIGATION | ) |

) Civ. No. 10-1114-SLR

)
)

---

Joseph J. Bodnar, Esquire of Law Offices of Joseph J. Bodnar, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Jacob A. Goldberg, Esquire and Gerald D. Wells, III, Esquire of Faruqi & Faruqi, LLP; Edwin J. Mills, Esquire and Michael J. Klein, Esquire of Stull, Stull & Brody; and, Gregory M. Egleston, Esquire of Egleston Law Firm.

Robert Scott Saunders, Esquire, Stephen Dale Dargitz, Esquire, and Daniel R. Ciarrocki, Esquire of Skadden, Arps, Slate, Meagher & Flom, Wilmington, Delaware. Counsel for Defendant. Of Counsel: Michael J. Prame, Esquire, Sarah A. Zumwalt, Esquire, and Julia E. Zuckerman, Esquire of Groom Law Group, Chartered.

---

## MEMORANDUM OPINION

Dated: May **3**, 2013
Wilmington, Delaware

**ROBINSON, District Judge**

## I. INTRODUCTION

On December 20, 2010, plaintiffs Karen Outten ("plaintiff Outten") and James Bradford (collectively "plaintiffs Outten and Bradford"), individually and on behalf of all others similarly situated, instituted an Employee Retirement Income Security Act ("ERISA") class action against Wilmington Trust Corporation, et al.[1] (D.I. 1 at ¶ 1). On January 31, 2011, plaintiff Julie Gray ("plaintiff Gray"), on behalf of herself and a class of persons similarly situated, instituted an ERISA class action against Wilmington Trust Corporation, et al.[2] (D.I. 1 at ¶¶ 8-20 in 11-00101) On February 28, 2011, plaintiff Gray filed a motion for consolidation and appointment of co-lead and liaison counsel. (D. I. 23) Plaintiffs Outten and Bradford filed a competing motion for consolidation and appointment of lead counsel on March 14, 2011. (D.I. 26) On March 15, 2012, the court ordered the cases consolidated and appointed Interim Lead and Co-Lead counsel. (D.I. 35; D.I. 36)

On May 25, 2012, plaintiffs Julie Gray, Karen Outten, and James Bradford[3]

---

[1]Plaintiff Outten named the following defendants: Wilmington Trust Corporation, Wilmington Trust Company, Wilmington Trust Corporation Employee Benefits Committee, David R. Gibson, Gary E. Butler, Rebecca A. DePorte, Michael A. DiGregorio, William J. Farrell II, I. Gail Howard, Kevin N. Rakowski, Diane M. Sparks, and Doe Defendants 1-10. (D.I. 1 at ¶¶ 18-33)

[2]Plaintiff Gray named the following defendants: Wilmington Trust Corporation, Wilmington Trust Company, The Wilmington Trust Corporation Employee Benefits Committee, David R. Gibson, Rebecca A. DePorte, Michael A. DiGregorio, William J. Farrell II, I. Gail Howard, Kevyn N. Rakowski, Diane M. Sparks, Gary E. Butler, and Ted T. Cecala. (D.I. 1 at ¶¶ 8-20 in 11-00101)

[3]Plaintiffs filed on their own behalf, on behalf of the Wilmington Trust Company Thrift Savings Plan, and on behalf of a class of similarly situated participants and beneficiaries of the Wilmington Trust Company Thrift Savings Plan.

(collectively "plaintiffs") filed an amended consolidated complaint ("complaint") against all defendants[4] (collectively "defendants").  (D.I. 38)  Pending before the court is defendants' Rule 12(b) motion to dismiss plaintiffs' consolidated complaint for breach of ERISA's fiduciary duties.  (D.I. 42)  The court has jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

## II. BACKGROUND

### A. Parties

Plaintiffs Gray and Outten are residents of the State of Delaware.  Plaintiff Bradford is a resident of the State of Pennsylvania.  Each plaintiff maintained an investment in Wilmington Trust stock in their individual account in the Wilmington Trust Company Thrift Savings Plan ("Plan") during the class period.  (D.I. 38 at 22-24)

Defendant Wilmington Trust Corporation ("WT Corp") was a financial holding company that provided regional banking services throughout the mid-Atlantic region, as well as wealth advisory services and corporate client services to clients in the United States and overseas.[5]  WT Corp was founded in 1901 and was headquartered in Wilmington, Delaware.  Plaintiffs allege that WT Corp was a de facto fiduciary under 29 U.S.C. § 1002(21)(A) and through the doctrine of respondeat superior.  (D.I. 38 at 25-

---

[4]Wilmington Trust Employee Benefit Administrative Committee; Wilmington Trust Corporation and Wilmington Trust Company (collectively "corporate defendants"); Ted T. Cecala, David R. Gibson, Rebecca A. DePorte, Michael A. DiGregorio, William J. Farrell II, I. Gail Howard, Kevin N. Rakowski, Diane M. Sparks and Gary E. Butler (collectively "individual defendants").  As needed, each individual defendant will be referred to as "defendant 'last name.'"

[5]Wilmington Trust is now "part of the M&T Bank Corporation." *See* http://www.wilmingtontrust.com/wtcom/index.jsp?section=About.

34)

Defendant Wilmington Trust Company ("WT Bank") was the wholly-owned bank subsidiary of WT Corp. WT Bank sponsored the Plan, was the Plan administrator, a named fiduciary, and served as the Plan's trustee. WT Bank was a named fiduciary of the Plan. (D.I. 38 at ¶ 28)

Defendant Wilmington Trust Employee Benefit Administrative Committee (the "Committee") managed and administered the Plan and its assets. The Committee acted as a fiduciary of the Plan. (D.I. 38 at ¶ 35)

Defendant Gibson served as the Chairman of the Committee from December 31, 2006 until May 13, 2011 (shortly before the closing of the M&T Bank Corporation ("M&T") acquisition of WT Corp). He also served at relevant times as WT Corp's Chief Financial Officer (CFO), Chief Operating Officer (COO), and Executive Vice President. (D.I. 38 at ¶ 36)

Defendant DePorte served as a member of the Committee from December 31, 2006 until May 13, 2011. She also served as senior vice president of Personal Financial Services at the WT Corp during the class period. (D.I. 38 at ¶ 37)

Defendant DiGregorio served as a member of the Committee from December 31, 2006 until May 13, 2011. He also served as Executive Vice President of WT Corp and of WTC, and as Secretary and General Counsel of WT Corp and WT Bank, during the class period. (D.I. 38 at ¶ 38)

Defendant Farrell served as a member of the Committee from December 31, 2006 until May 13, 2011. He also served as Executive Vice President of WT Corp and WT Bank, and had oversight of WT Bank's Corporate Client Services Department

3

during the class period.  (D.I. 38 at ¶ 39)

Defendant Howard served as a member of the Committee from December 31, 2006 until May 13, 2011.  She also served as Vice President, Human Resources for WT Corp during the class period.  (D.I. 38 at ¶ 40)

Defendant Rakowski served as a member of the Committee from December 31, 2006 until May 13, 2011.  He also served as WT Corp's Controller and Senior Vice President since 2006.  (D.I. 38 at ¶ 41)

Defendant Sparks served as a member of the Committee from December 31, 2006 until May 13, 2011.  He also served as Vice President, Corporate AML Officer & Division Manager of Client Operations during the class period.  (D.I. 38 at ¶ 42)

Defendant Butler served as a member of the Committee from December 31, 2006 until May 13, 2011.  He also served as Vice President in charge of tax services for Wilmington Trust during the class period.  (D.I. 38 at ¶ 43)

Plaintiffs allege that defendants Gibson, DePorte, DiGregorio, Farrell, Howard, Rakowski, Sparks and Butler are fiduciaries by virtue of their management positions and their service on the Committee.  (D.I. 38 at ¶ 44)

Defendant Cecala was the Company's Chief Executive Officer and Chairman of the Board of Directors, as well as the Chairman and Chief Executive Officer of its subsidiaries, including WT Bank, during most of the class period, until he resigned those positions on June 3, 2010 and July 19, 2010, respectively.  He appointed the members of the Committee, which managed and administered the Plan on a day-to-day basis.  Plaintiffs allege that defendant Cecala is a fiduciary by virtue of his management position and his role in appointing members of the Committee.  (D.I. 38 at ¶ 45)

4

## B. Factual Background

Plaintiffs bring this action under §§ 404 & 502(a) of ERISA, 29 U.S.C.§§ 1104 & 1132(a), on behalf of themselves and other participants in the Plan, where the holdings included common stock of WT Corp or units of Wilmington Trust Common Stock Fund from December 31, 2006 to May 13, 2011. (D.I. 38 at ¶ 1) Plaintiffs allege the following causes of action: (1) imprudent investment against all defendants for allowing investment of Plan assets in WT Corp stock (*id.* at ¶¶ 242-47); (2) misrepresentations and nondisclosure against all defendants for withholding material information from plaintiffs, which would have allowed them to make informed decisions about investment under the Plan (*id.* at ¶¶ 248-55); (3) divided loyalty against the individual defendants for breaching their fiduciary duties by not acting in the interests of the Plan (*id.* at ¶¶ 256-61); (4) breach of the duty to properly appoint, monitor and oversee the Committee and its members against WT Corp, WT Bank and defendant Cecala (*id.* at ¶¶ 262-66); and (5) defendants Gibson, Farrell and Cecala failed to avoid conflicts of interest, thereby breaching their fiduciary duties (*id.* at ¶¶ 267-273).

The Plan allowed participants to contribute a deferred percentage of their pay, with WT Corp matching a percentage of the contributions. (D.I. 38 at ¶ 57) The Plan consisted of two components described in the introduction:

> One component of the Plan is intended to qualify as a profit sharing plan . . . . The other component is intended to qualify as a qualified stock bonus plan . . . and as an employee stock ownership plan (ESOP) . . . . This component includes contributions invested in Qualifying Employer Securities and shall be considered the ESOP component of the plan. The ESOP component of the Plan is intended to primarily invest in common stock of the

5

Employer.

(D.I. 44 at WTCo000006)

The complaint fully sets forth plaintiffs' factual allegations regarding the situation leading up to M&T's "take-under" of WT Corp. (D.I. 38) Throughout 2007, WT Corp increased its commercial real estate and construction loans. On April 20, 2007, WT Corp assured its investors that there was "nothing on the horizon to suggest a change in credit quality" and the "economy in our Regional Banking footprint is healthy and stable."[6] WT Corp also alleged that it consistently applied rigorous underwriting standards. (D.I. 38 at ¶¶ 92-94, 97-98)

As late as January 19, 2008, WT Corp did not acknowledge the concerns of its banking peers regarding the viability of the housing market, responding to questions regarding its construction loans by suggesting that perhaps WT Corp had a different set of builders. (D.I. 38 at ¶¶ 103-05) As its banking peers acknowledged significant problems in 2008, in April and May of 2008, WT Corp continued to assert that its construction and home loan portfolios were locally focused and not suffering from the deteriorating housing market conditions in the rest of the country. (Id. at ¶¶ 109-13) On July 18, 2008, WT Corp reported a loss for the 2008 second quarter, but continued to defend and even increase its loan portfolio. (Id. at ¶ 115) By January 7, 2009, WT Corp appeared to be acknowledging the decline in the housing market, but maintained that WT Corp was not going "off an economic cliff," and retained a positive outlook. (Id.

_____

[6]The majority of the construction was single-family residential, in a tri-sate area of "Delaware and north into Pennsylvania and a little bit into New Jersey and the eastern shore of Maryland." Defendant Gibson stated that WT Corp did not "lend to the large national builders." (D.I. 38 at ¶ 100)

6

at ¶¶ 125-30) WT Corp did not adjust its underwriting standards for loans in light of its losses. (*Id.* at ¶¶ 132-35)

By December 2009, WT Corp's commercial real estate and construction loans were about 22% of its loan portfolio, reportedly twice that of other banks.[7] On January 29, 2010, WT Corp acknowledged fourth quarter losses, with defendant Cecala quoted as stating that "it is no surprise that most of the deterioration we have seen in credit quality has been associated with construction borrowers in Delaware." (D.I. 38 at ¶¶ 155-58) Throughout 2010, WT Corp attempted to right itself by raising capital. It then looked to be sold or acquired and, ultimately, WT Corp was acquired by M&T, with the merger closing on May 16, 2011.[8] (*Id.* at ¶¶ 170, 187, 195-96, 206, 223) Over the class period, WT Corp stock price fell 90%, from $43.19 per share on January 3, 2007 to a last closing price of $4.45 per share before delisting on May 13, 2011. (*Id.* at ¶ 224)

## III. SUBJECT MATTER JURISDICTION

### A. Standard

Once jurisdiction is challenged, the party asserting subject matter jurisdiction has the burden of proving its existence. *See Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc.*, 227 F.3d 62, 69 (3d Cir. 2000). Under Rule 12(b)(1), the court's jurisdiction

---

[7]The Wall Street Journal reported that regulators reviewed WT Corp's loan book in 2010 and discovered WT Corp was relying on outdated appraisals despite its assurances that it reviewed its loans on a current basis. (D.I. 38 at ¶ 174)

[8]In the second quarter of 2010, WT Corp's loan loss reserves jumped to $205.2 million (D.I. 38 at ¶ 188), to $281.5 million in the third quarter (*id.* at ¶ 205), and $135.6 million in the fourth quarter after M&T acquired it (*id.* at ¶ 216). M&T then estimated a further markdown of just over $500 million was required. (*Id.* at ¶ 203)

may be challenged either facially (based on the legal sufficiency of the claim) or

factually (based on the sufficiency of jurisdictional fact). *See* 2 *James W. Moore,*

*Moore's Federal Practice* § 12.30[4] (3d ed. 1997). Under a facial challenge to

jurisdiction, the court must accept as true the allegations contained in the complaint.

*See id.* Dismissal for a facial challenge to jurisdiction is "proper only when the claim

'clearly appears to be immaterial and made solely for the purpose of obtaining

jurisdiction or . . . is wholly insubstantial and frivolous.'" *Kehr Packages, Inc. v. Fidelcor,*

*Inc.*, 926 F.2d 1406, 1408-09 (3d Cir. 1991) (quoting *Bell v. Hood*, 327 U.S. 678, 682

(1946)).

Under a factual attack, however, the court is not "confine[d] to allegations in the .

. . complaint, but [can] consider affidavits, depositions, and testimony to resolve factual

issues bearing on jurisdiction." *Gotha v. United States*, 115 F.3d 176, 179 (3d Cir.

1997); *see also Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891-92 (3d

Cir. 1977). In such a situation, "no presumptive truthfulness attaches to plaintiff's

allegations, and the existence of disputed material facts will not preclude the trial court

from evaluating for itself the merits of jurisdictional claims." *Carpet Group*, 227 F.3d at

69 (quoting *Mortensen*, 549 F.2d at 891). Although the court should determine subject

matter jurisdiction at the outset of a case, "the truth of jurisdictional allegations need not

always be determined with finality at the threshold of litigation." 2 Moore § 12.30[1].

Rather, a party may first establish jurisdiction "by means of a nonfrivolous assertion of

jurisdictional elements and any litigation of a contested subject-matter jurisdictional fact

issue occurs in comparatively summary procedure before a judge alone (as distinct

8

from litigation of the same fact issue as an element of the cause of action, if the claim survives the jurisdictional objection)." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 537-38 (1995) (citations omitted).

Article III standing requires: "(1) an injury-in-fact . . . ; (2) a causal connection between the injury and the conduct complained of; and (3) that it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Winer Family Trust v. Queen*, 503 F.3d 319, 325 (3d Cir. 2007). To have standing, "the 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (quoting *Sierra Club v. Morton*, 405 U.S. 734, 734-735 (1972)).

## B. Analysis

Defendants allege that plaintiff Outten does not have constitutional standing, as she was not injured by the allegations of artificial inflation; instead, plaintiff Outten benefitted from the alleged artificial inflation as a "net seller." (D.I. 43 at 9-10) As the Third Circuit has not ruled directly on the issue of constitutional standing in this context,[9] the court looks to the Sixth and Eighth Circuit Courts which have directly addressed how to calculate loss to determine if an injury-in-fact occurred. *Taylor v. KeyCorp*, 680

[9]The court understands that the Third Circuit has expressed support for using an "alternative investment" methodology **to calculate damages** in cases dealing with breach of fiduciary breach under ERISA, when addressing a question of statutory standing of a former employee. *See Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 301 (3d Cir. 2007) ("the measure of damages is the amount that affected accounts would have earned if prudently invested") (emphasis added). Nevertheless, the discussion in *Graden* embraced by plaintiffs was dicta and was not directed to the issue of constitutional standing.

9

F.3d 609 (6th Cir. 2012); *Brown v. Medtronic, Inc.*, 628 F.3d 451 (8th Cir. 2010). These Courts concluded that plaintiffs who were "net sellers" of company stock during the class period lacked Article III standing because they suffered no "actual injury." *Taylor*, 680 F.3d at 613; *Brown*, 628 F.3d at 458. Using an artificial inflation theory, individuals who sell their holdings during a time when the stock is claimed to be artificially inflated, would sell the holdings for more than they are worth, thereby benefitting the sellers. *Taylor*, 680 F.3d at 613 (finding that since plaintiff sold all of her units right after the beginning of the class period and did not repurchase any units - only acquiring some through a matching program which were subsequently sold - plaintiff suffered no loss as she earned a net profit). Where, as here, plaintiffs allege that defendants breached their fiduciary duties by withholding information, "the appropriate measure of damages [is] the difference between the investment as taken and the investment as it would have been if not tainted by withheld information." *Taylor*, 680 F.3d at 614 (citing *Brown*, 628 F.3d at 458). The court concludes that, at the initial stages of litigation, the more straightforward approach of artificial inflation should be used to establish injury-in-fact.

Plaintiff Outton sold 797 units and acquired only 89 units (through reinvestment of dividends) during the class period, resulting in a net sale of 708 units during the class period. (D.I. 43 at 9-10; D.I. 45 at ¶ 10) Plaintiff Outten's first sale was on March 17, 2008, for 32% less than her purchase price on February 15, 2007, and her second sale was June 5, 2008, for 25% less. (D.I. 47 at 6) On October 20, 2007, a news article reported that WT Corp had increased the amount it set aside for potential losses because of troubles with its construction loans. (D.I. 38 at ¶ 102) The January 18, 2008 earnings release reported that nonperforming loans had increased by about $7

10

million; however, WT Corp defended its construction portfolio during a conference call with an analyst the next day. (*Id.* at ¶ 105) On May 12, 2008, WT Corp's SEC Quarterly Report also defended the portfolio. (*Id.* at ¶ 112) On July 18, 2008, WT Corp reported a loss of $19.5 million for the 2008 second quarter; this news resulted in a 6.5% decline in the stock price. (*Id.* at ¶¶ 114, 118)

Plaintiff Outten must provide facts sufficient to show a causal connection between the injury and the conduct complained of, namely the withholding of information by the Committee. The net asset value ("NAV") of the Wilmington Stock Fund[10] decreased overall from February 15, 2007 to June 5, 2008, from $17.41 to $12.08; however, the values do not show a steady decrease, instead fluctuating during this time period.[11] These fluctuations included increases in the NAV after each of the

---

[10]Defendants' analysis presents these NAV values and plaintiffs rely on these in their arguments regarding plaintiff Outten's losses when selling her stock; therefore, the court's analysis will follow suit. (D.I. 45 at ex. 2; D.I. 47 at 6)

[11]

| Date | NAV |
|----------|---------|
| 2/15/07 | $17.21 |
| 9/26/07 | $15.39 |
| 11/15/07 | $13.80 |
| 12/26/07 | $14.22 |
| 2/15/08 | $12.88 |
| 3/17/08 | $11.71 |
| 6/5/08 | $12.84 |
| 8/15/08 | $9.64 |

(D.I. 45 at ex. 2)

negative events listed above, including the October 20, 2007 negative news article. As other factors may be influencing stock prices, plaintiffs must allege more than a "price drop throughout a proposed class period to articulate an injury to create standing."[12] *Brown*, 628 F.3d at 456 (citing *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005)).

For the foregoing reasons, the court concludes that plaintiff Outten was a net-seller and has not shown the required causal connection to the alleged bad conduct. Plaintiffs' allegations of concealment and withholding of information by defendants throughout the class period, leading to artificial inflation of WT Corp's stock price, are inextricably linked to their claims that WT Corp's stock was too risky for retirement savings. Therefore, the court will not separate out the artificial inflation claims and concludes that plaintiff Outten lacks constitutional standing.

## IV. STANDARD OF REVIEW

In reviewing a motion filed under Federal Rule of Civil Procedure 12(b)(6), the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406 (2002). A court may consider the pleadings, public record, orders, exhibits attached to the complaint, and documents incorporated into the complaint by reference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384-85 n.2 (3d Cir. 1994). A complaint must contain "a short and plain statement of the claim showing

---

[12]Plaintiffs recognize the ongoing issues with mortgage and construction loans other lenders were seeing during this time. (*See, e.g.*, D.I. 38 at ¶ 112)

that the pleader is entitled to relief, in order to give the defendant fair notice of what the

. . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 545 (2007) (interpreting Fed. R. Civ. P. 8(a)) (internal quotations omitted). A

complaint does not need detailed factual allegations; however, "a plaintiff's obligation to

provide the 'grounds' of his entitle[ment] to relief requires more than labels and

conclusions, and a formulaic recitation of the elements of a cause of action will not do."

*Id*. at 545 (alteration in original) (citation omitted). The "[f]actual allegations must be

enough to raise a right to relief above the speculative level on the assumption that all of

the complaint's allegations are true." *Id*. Furthermore, "[w]hen there are well-ple[d]

factual allegations, a court should assume their veracity and then determine whether

they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 129

S.Ct. 1937, 1950 (2009). Such a determination is a context-specific task requiring the

court "to draw on its judicial experience and common sense." *Id.*

## V. DISCUSSION

### A. Breach of Duty of Care

ERISA requires that fiduciaries perform their duties with care, skill, prudence and

diligence.[13] 29 U.S.C. § 1104(a)(1). Failure to do so may give rise to liability, if the

---

[13]Specifically, §404 provides:

> (a) Prudent man standard of care
> (1) Subject to sections 1103(c) and (d), 1342, and 1344 of
> this title, a fiduciary shall discharge his duties with respect to
> a plan solely in the interest of the participants and
> beneficiaries and--
> (A) for the exclusive purpose of:
> (i) providing benefits to participants and their beneficiaries;
> and

13

breach of fiduciary duty causes a loss to the beneficiaries.  29 U.S.C. § 1105.  The

Third Circuit held that the decision of an ESOP fiduciary to invest in employer stock is

entitled to judicial deference, i.e., the decision is entitled to a "presumption of prudence"

and reviewed for abuse of discretion, if the investment in a particular stock was not

"absolutely required," but was "more than simply permitted.[14]  *Moench v. Robertson*, 62

F.3d 553, 571 (3d Cir. 1995).  A "plaintiff may overcome that presumption by

establishing that the fiduciary abused its discretion by investing in employer securities."

*Id.*  The Third Circuit extended this presumption of prudence to several other types of

pension plans categorized under ERISA, reasoning that these plans also promoted

investment in employer securities.  *Edgar v. Avaya, Inc.*, 503 F3d 340, 347 (3d Cir.

2007) (finding that the presumption of prudence applies at the motion to dismiss stage).

The current litigation involves a savings plan, which "**shall** consist of two

components," one of which provides for investment as an ESOP, directing the

---

> (ii) defraying reasonable expenses of administering the plan;
> (B) with the care, skill, prudence, and diligence under the
> circumstances then prevailing that a prudent man acting in a
> like capacity and familiar with such matters would use in the
> conduct of an enterprise of a like character and with like
> aims;
> (C) by diversifying the investments of the plan so as to
> minimize the risk of large losses, unless under the
> circumstances it is clearly prudent not to do so; and
> (D) in accordance with the documents and instruments
> governing the plan insofar as such documents and
> instruments are consistent with the provisions of this
> subchapter and subchapter III of this chapter.

29 U.S.C. § 1104(a)(1).

[14]A fiduciary's decision is subject to de novo review if a trust merely permits the
fiduciary to invest in a particular stock. *Moench*, 62 F.3d at 571.

fiduciaries **"to primarily invest in common stock of the Employer."**[15] (D.I. 44 at WTCo000006 (emphasis added)) The provision for the investment in employer stock for the ESOP component does more than merely permit the Plan's fiduciaries to invest in Wilmington Trust Company stock ("WTC stock"); it instructs them to do so. _Edgar_, 503 F3d at 347 (applying the presumption of prudence to a plan designed to promote investment in employer securities). The court concludes that the presumption of prudence applies to the Plan.

Having determined the appropriate standard of judicial review, the court now turns its attention to plaintiffs' allegations. To establish that defendants abused their discretion by continuing to invest in WTC stock, plaintiffs must allege sufficient facts to "show that the ERISA fiduciary could not have believed reasonably that continued adherence to the ESOP's direction was in keeping with the settlor's expectations of how a prudent trustee would operate."[16] _Moench_, 62 F.3d at 571. Specifically, a complaint must allege "the type of dire situation which would [have] require[d] defendants to disobey the terms of the Plans by not offering the [employer's stock] as an investment option, or by divesting the Plans of [the employer's] securities." _Edgar_, 503 F3d at 348. Courts must be cognizant that fiduciaries who are also directors of the corporation "serve two masters [a]nd the more uncertain the loyalties of the fiduciary, the less

---

[15]The "special rules for employer stock" state in part, "[t]he portion of your account invested in employer stock is part of an employee stock ownership plan and contains funds that are invested primarily in common stock of Wilmington Trust Corporation." (D.I. 44 at WTCo000137)

[16]Courts must consider that fiduciaries who diversify against the ESOP's direction would face liability if the employer's securities subsequently thrived. _Moench_, 62 F.3d at 572.

15

discretion it has to act." *Moench*, 62 F.3d at 572. A fiduciary in this position must show "a careful and impartial investigation of all investment decisions." *Id.* (citing *Martin v. Feilen*, 965 F.2d 660, 670 (8th Cir. 1992)).

The alleged facts demonstrate that WT Corp continued to make construction loans after its peers acknowledged the housing market decline. Statements disseminated by WT Corp through its directors show WT Corp seemingly turning a blind eye to the market's decline, averring that it used different builders and financed loans for real property in and around Delaware. Over the class period, WT Corp stock price fell 90%. Defendants have proffered no showing of a conscientious and impartial investigation or review of any of the Plan's investment decisions.[17] To the contrary, during the market decline, WT Corp was relying on outdated appraisals for its loan decisions. Drawing all inferences in favor of the plaintiffs, the court concludes that plaintiffs have set forth allegations which more closely resemble those in *Moench* than *Edgar*, and which plausibly suggest a dire enough situation to support an abuse of discretion by the fiduciaries (at least, sufficient to permit discovery).

## B. Breach of Duty to Disclose

Plaintiffs contend that defendants failed to provide information to Plan participants, which prevented them from making informed decisions about Plan investments. (D.I. 38 at ¶¶ 248-55) An ERISA fiduciary "may not materially mislead

---

[17]Defendants advocate that WT Corp needed to reach the point of imminent collapse before defendants could disobey the Plan's terms. (D.I. 43 at 3; D.I. 49 at 13) In *Edgar*, the Third Circuit stated that a company need not be "on the brink of bankruptcy before a fiduciary is required to divest a plan of employer securities," but the situation must be dire enough to require it. *Edgar*, 503 F3d at 349 n.13.

16

those to whom section 1104(a)'s duties of loyalty and prudence are owed." *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 440 (3d Cir. 1996). This duty includes "not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful." *Id.* at 441. A fiduciary of a plan must inform participants about the risks associated with investing in the plan, but does "not have a duty to 'give investment advice' or 'to opine on' the stock's condition." *Edgar*, 503 F.3d at 350 (citing *Unisys*, 74 F.3d at 443).

The Plan description and written communications provided plaintiffs with information regarding the investment options and the associated risks. It also provided summaries of past performance, warned against fluctuations due to market conditions, and did not guarantee any particular future results. The Plan specifically described the Wilmington Trust Stock Fund. (D.I. 43 at 23-25; see generally D.I. 44); *Edgar*, 503 F.3d at 350.

According to the analytical framework prescribed by the Third Circuit in *Edgar*, although "an ERISA fiduciary 'may not materially mislead those to whom section 1104(a)'s duties of loyalty and prudence are owed,'" *id.*, such a fiduciary may neither act on (i.e., sell) nor share confidential corporate information before it has been publicly released by the corporation. The reasoning underlying the above principle was explained in *Edgar* as follows:

> [H]ad the [defendant fiduciaries in that case] "publicly released any adverse information they had prior to the [corporate] announcement, under the 'efficient capital markets hypotheses,' such a disclosure would have resulted in a swift market adjustment." Therefore, . . . "the Plans would not have been able to sell their [corporate] stock

17

> holdings at the higher, pre-announcement price, and the
> Plans would have sustained the same losses they incurred
> when the Company [Avaya] publicly announced the quarterly
> results in April 2005." In addition, . . . had defendants
> decided to divest the Plans of Avaya stock prior to [the April
> 2005 public announcement], based on information that was
> not publicly available, they would have faced potential
> liability under the securities laws for insider trading.
>
> . . .
>
> In sum, we conclude that defendants fulfilled their duty of
> disclosure under ERISA by informing Plan participants about
> the potential risks associated with investment in the Avaya
> Stock Fund. That defendants did not inform Plan
> participants about several adverse corporate developments
> prior to [the April 2005] earnings announcement, does not
> constitute a breach of their disclosure obligations under
> ERISA.

*Id.*

Consistent with the above analysis, plaintiffs have failed to adequately claim that

defendants breached their disclosure obligations under ERISA.[18]

## C. Breach of Duty of Loyalty

Plaintiffs allege divided loyalty against the individual defendants for breaching

their fiduciary duties by not acting in the interests of the Plan and that defendants

Gibson, Farrell and Cecala failed to avoid conflicts of interest. (D.I. 38 at ¶¶ 256-61,

---

[18]To some extent, plaintiffs arguably allege that defendants actively concealed WT Corp's financial distress and engaged in violations of law or regulations, which could support a breach of disclosure claim. (D.I. 47 at 32; D.I. 38 at ¶ 249); *In re Schering-Plough Corp. Erisa Litig.*, Civ. No. 08-1432, 2010 WL 2667414, at \*6-7 (D.N.J. Aug. 15, 2007); *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, MDL No. 1658, 2009 WL 790452, at \*5 (D.N.J. Mar. 23, 2009). Even if the court accepts that plaintiffs' allegations pass muster under *Twombly*, plaintiffs are not able to show loss causation. The efficient capital markets hypothesis, recognized by the Third Circuit, applies - had defendants released the allegedly withheld information earlier, the Plan would not have been able to sell the WT Corp units at a higher price as the market would have swiftly adjusted itself, resulting in the same loss to plaintiffs. *Edgar*, 503 F.3d at 350.

Case 1:10-cv-01114-SLR Document 51 Filed 05/03/13 Page 20 of 24 PageID #: 858

267-73) Under ERISA, a fiduciary may wear two hats; specifically, the statute allows officers and employees of a company to serve as fiduciaries of the company's ERISA plans. ERISA, § 408(c)(3), 29 U.S.C. § 1108(c) (3). Such fiduciaries are still required to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries," which may require in some circumstances a neutral referee or to explicitly inquire into conflict of interest. ERISA, § 404, 29 U.S.C. § 1104; *McMahon v. McDowell*, 794 F.2d 100, 110 (3rd Cir. 1986).

More specifically, plaintiffs assert that the compensation of defendants Gibson, Farrell, and Cecala was tied to the performance of WT Corp's stock and that they had information that was inconsistent with the rosy picture of WT Corp's financial condition they continued to paint as corporate officers. According to plaintiffs, by these assertions they have sufficiently pled that defendants failed to avoid conflicts of interest and, therefore, breached their duty of loyalty to Plan participants.

The court recognizes that the mere fact that compensation is tied to stock prices, without more, is not necessarily enough to show the existence of a breach of duty of loyalty or a conflict of interest. *See, e.g., Trenton v. Scott Paper Co.,* 832 F.2d 806, 809 (3d Cir. 1987); *Johnson v. Radian Group, Inc.*, Civ. No. 08-2007, 2010 WL 2136562, at \*14 (E.D. Pa. May 26, 2010). However, the court concludes that the allegations at bar are sufficient to withstand the motion to dismiss, and that a determination of whether a conflict of interest arose under the circumstances at bar is better determined on a developed record. *See Advanta Corp. ERISA Litig.,* Civ. No. 09-4974, 2011 WL 45284341, at \*4 (E.D. Pa. Sept. 30, 2011).

19

## D. Breach of Duty to Monitor

Plaintiffs also allege that defendant Cecala[19] breached the duty to properly

appoint, monitor and oversee the Committee and its members by his failure to

adequately inform the Committee about the true financial and operating condition of WT

Corp. Alternatively, plaintiffs allege that, if defendant did so inform the Committee, he

then allowed the Committee to improperly invest in WT Corp's stock.

ERISA imposes a duty to monitor on those individuals empowered to appoint

and remove plan fiduciaries. *Graden v. Conexant Systems, Inc.*, 574 F. Supp. 2d 456,

466 (D.N.J. 2008); *In re RCN Litig.*, Civ. No. 04-5068, 2006 WL 753149, at *9 (D.N.J.

Mar. 21, 2006). Consistent with the court's conclusion above regarding the

Committee's duty to disclose, however, the court finds that these allegations do not

sufficiently allege a cause of action against defendant Cecala. In other words, even if

defendant Cecala had informed the Committee of the true financial and operating

condition of WT Corp, the Committee was precluded from doing anything with that

information until the information was publicly disclosed. Under these circumstances,

there can be no breach of the duty to monitor.

## E. WT Corp as Fiduciary

As WT Corp is not a named fiduciary of the Plan, plaintiffs allege that it is a

functional or de facto fiduciary through the doctrine of respondeat superior. (D.I. 38 at

¶¶ 27, 29) Under ERISA,

---

[19]Although the claim is asserted against WT Corp, WT Bank and Cecala, all of
the factual information relates to the alleged conduct of individual defendant Cecala.
(D.I. 38 at ¶¶ 262-66)

20

> a person is a fiduciary with respect to a plan to the extent (I)
> he exercises any discretionary authority or discretionary
> control respecting management of such plan or exercises
> any authority or control respecting management or
> disposition of its assets, (ii) he renders investment advice for
> a fee or other compensation, direct or indirect, with respect
> to any moneys or other property of such plan, or has any
> authority or responsibility to do so, or (iii) he has any
> discretionary authority or discretionary responsibility in the
> administration of such plan.

29 U.S.C. § 1002(21)(A). The Third Circuit liberally construes "fiduciary," making it
clear "that one need not have discretion in exercising authority or control over the
management or disposition of plan assets in order to qualify as a fiduciary under §
1002(21)(A)(I)." *In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 346 (3d Cir. 2004).

Plaintiffs allege that WT Corp effectively controlled WT Bank and that the two
entities shared many officers, including defendant Farrell (executive vice president) and
defendant Gibson (chief financial officer). (D.I. 38 at ¶ 27) The court concludes that
plaintiffs have adequately pled a "de facto" fiduciary status, under the liberal definition,
by further alleging that the Committee members were employees of WT Corp and
delegated some responsibility for the administration and investment of the Plan to other
WT Corp employees. (*Id.*)

The Third Circuit, in *McMahon v. McDowell*, 794 F.2d 100, 109 (3d Cir. 1986),
recognized that, "if a beneficiary or participant can show that the plan fiduciaries
breached their duties, he may also be able to recover damages, for the benefit of the
plan, directly from the employer." This holding is consistent with the following cases
from other circuits: *Howell v. Motorola, Inc.*, 633 F.3d 552 (7th Cir. 2011) (implicitly
recognizing respondeat superior liability in ERISA cases); *Hamilton v. Carell*, 243 F.3d

21

992, 1001–02 (6th Cir. 2001) (respondeat superior may be a source of liability); *Nat'l Football Scouting Inc. v. Continental Assurance Co.*, 931 F.2d 646, 648-650 (10th Cir. 1991) (supporting the application of respondeat superior in ERISA cases); and *Am. Fed'n of Unions Local 102 Health & Welfare Fund v. Equitable Life Assurance Soc. of the U.S.*, 841 F.2d 658, 665 (5th Cir. 1988) (holding that "[t]he doctrine of respondeat superior can be a source of liability in ERISA cases").

Here plaintiffs have alleged that WT Corp "knowingly and actively participated in the breaches of fiduciary duty," as it knew that its stock was offered in the Plan and was aware that it engaged in "unsafe or unsound practices," exposing the Plan to risks. (D.I. 38 at ¶¶ 29-31) WT Corp should have known that its stock was an imprudent investment for the Plan, but did not adequately warn or instruct its employees or the individual defendants. (*Id.* at ¶ 32) WT Corp ignored its duty to monitor its employees and properly communicate information needed for the administration of the Plan. (*Id.* at ¶ 33) WT Corp also appointed fiduciaries to the Committee for its own benefit.[20] (*Id.* at ¶ 34)

The court concludes that plaintiffs have proffered enough facts to plausibly show

_____

[20]Plaintiffs allege:

> The Corporate Defendants also had incentive to, and did, appoint fiduciaries who were likely to, and did, maintain the status quo of Plan's investment in the Wilmington Trust Common Stock Fund because the Corporate Defendants reaped the benefits of the Company stock being offered and held as a plan investment option, including tax benefits, keeping significant amounts of stock in friendly hands, and helping with the Corporate Defendants' cash flows.

(D.I. 38 at ¶ 34)

that the doctrine of respondeat superior applies, at least enough to warrant discovery on the surrounding facts, for the court to review.[21]

## VI. CONCLUSION

For the above reasons, defendants' motion to dismiss is granted as to plaintiffs' claims regarding breach of the duties to disclose and to monitor, as well as to the standing issue. The motion is denied as to plaintiffs' claims regarding breach of the duties of care and of loyalty, as well as to the respondeat superior issue.

---

[21]Until the Third Circuit directly addresses this issue, the court will follow the Third Circuit's current direction of liberally defining fiduciaries and allow discovery on the circumstances illuminating the scope of employment.

23